KAHN v. STARRELLS.

(Circuit Court, E. D. Pennsylvania. July 15, 1904.)

No. 17.

1. PATENTS—NOVELTY—FLAT KNIT CAPS.

The Kahn patent, No. 669,011, claim 3, covering as an article of manufacture a flat knit cap formed from a single length of tubular fabric by distending and setting it on a block or former, is void for lack of novelty; the product, as distinguished from the process of making, differing not at all from other caps in extensive prior use.

2. SAME—PROCESS—INVENTION.

The Kahn patent, No. 669,011, claims 1 and 2, which cover a method or process of making flat knit caps, are void for lack of patentable invention, the process claimed and described differing from that previously used only in the degree of prominence given to certain of the steps employed, which are essentially alike in both; the desired shape being obtained in the older method more by fashioning in the knitting, and in that of the patent more by distending the knitted fabric by stretching. The patent held, also, not infringed, if conceded validity.

3. SAME—LESSENING COST OF MANUFACTURE.

An improvement in a mechanical process which results in increased rapidity of manufacture, and consequent cheapening in cost of the article, does not for that reason alone disclose invention, where the steps in the process remain the same; the only difference being in the relative extent to which certain of such steps are carried.

In Equity. Suit for infringement of letters patent No. 669,011 for a flat knit cap, and art of making same, granted to Nathan E. Kahn February 26, 1901. On final hearing.

Joseph C. Fraley, for complainant.
Lewis L. Smith, for defendant.

ARCHBALD, District Judge.[1] The patent in suit was issued to Nathan E. Kahn February 26, 1901, and has to do with the making of flat knit worsted caps, having a fuzzy or fleecy exterior, familiarly known as "tam-o'-shanters." If the case turned on whether Kahn or the defendant Starrells was the first to devise and use the particular method in controversy, there would be little difficulty in disposing of it. The application on which the patent is based was filed July 18, 1900, but the evidence shows that Kahn was at work on the idea as early as December, 1899, and had fully compassed it by the middle of March following; offering his goods to the trade and taking orders in May and June. This is substantiated by a number of disinterested witnesses, whose stories are circumstantial and convincing, and is also sustained by documentary proof in the way of letters. The evidence to meet this on the part of the defendant is far from satisfactory. So far as his own testimony is concerned, it consists of vague assertions, which do not stand analysis, that he was making similar efforts to imitate the imported "tams" about the same time that Kahn was, and that he had his goods ready for the market as early as May or June of that year. The complainant's salesman, however, experienced no competition until the fall; and there is evidence to show that the first that the defendant did in the way of turning out anything was in August, and that it was in imitation of caps which emanated from Kahn, and were then in the hands of the trade, of which he had procured a sample. Without going into further details, it is sufficient to say that Kahn is clearly entitled to whatever merit there is in the invention, and that the claim of the defendant to prior knowledge or use cannot be sustained.

There are three claims in the patent, as follows:

"(1) The method of forming flat knit caps, which consists in forming an elongated tubular body with a band-forming selvage at its lower open end, then flattening the tube by expanding it in a single, narrow plane, at a point between its ends, said plane being at right angles to the longitudinal axis of the tubular body and finally setting the article in its flat distended shape, substantially as described.

"(2) The method of forming flat knit caps, which consists in forming an open-ended tube of knit fabric with a band-forming selvage at one end, then raising a nap on the exterior of the tube, then closing the top of the tube by gathering the edge thereof together about its axis, then flattening the tube by expanding it or distending it at a point between its ends, the plane of such expansion being at a right angle to the longitudinal axis of the tubular body,

and finally setting the article in its flat distended shape, substantially as described.

"(3) As a new article of manufacture, a flat knit cap, formed from a single length of tubular fabric, having a band-forming selvage at its lower end, its upper end gathered and secured in closed position, said tubular body being expanded to flatten the same, and then set in a narrow plane at right angles to its longitudinal axis, substantially as described."

The first two, as it will be observed, are for a special method or process of manufacture, and the third for the resultant product. In no event, as it seems to me, can the latter be sustained. In shape, character of fabric, and uses to which they are put, the caps manufactured by the process described in the patent differ not at all from other goods in ex-tended prior use, of which they are intended to be closely imitative. The only distinction suggested is that each cap, instead of being knit into approximate shape, as heretofore, is produced out of a "single length of tubular fabric" by distending and setting it on a block or "former," in which, outside the economy of effort by which it is accomplished, there would seem to be no particular virtue, and which therefore presents as a product nothing that is new or patentable.

Of the two process claims, the first is the broader, omitting, as it does, the napping or brushing, and the closing or gathering in of the top. But the same considerations apply to both, and the question is whether they involve anything patentably novel. Confining our attention particularly to the second claim, as the more specific, five divisions or steps will be recognized: (a) Forming an open-ended tube of knit fabric, with a band-forming selvage at one end; (b) raising a nap on the exterior of the tube; (c) closing the top of the tube by gathering the edge together about its axis; (d) flattening the tube by expanding or distending it at a right angle to its longitudinal axis; and finally (e) setting it in its flat, distended shape. Taking it as it stands, all that is thus described is admittedly old in the art, but not, as it is contended, as an organized series of steps coacting toward a common end. The order in which the different steps are given is made material, each being introduced by the word "then," which makes it relate to the one preceding, and the intention to have them co-operate is undoubtedly implied. But the question is whether the putting together in this way of simple mechanical operations already in use in the art involves the exercise of that inventive effort which it is the object of the law to foster and protect. Except in the rapidity with which a cap can be made, and the consequent cheapening of the cost—ten dozen being possible where one dozen was before—nothing particular is accomplished by the process; and while the result which is attained is not to be despised, and in some instances may of itself make out a claim to invention, for reasons which will presently appear it is not sufficient to do so here. Something is sought to be made out of the idea that the brushing or napping of the fabric gives it a new quality, which enables it to be successfully distended.; but, as this is only brought into the second claim, it would seem as though no great importance was attached to it by the inventor. The controlling thing against the patentability of this process is that not only does it represent what is old in the art, but in what is done, as well as in the way of doing it, it exactly duplicates the method already in vogue, differing from it only in the degree of prominence given to

certain of the steps employed. The accepted way for making these arti-cles of headgear was to take a piece of fabric which had either been knit into approximate shape, or, having been knit flat, was put into form by having its sides and top gathered together and sewed; then to raise a nap on it by brushing; and finally to flatten or distend it by blocking it into the exact shape desired, setting it in that shape by ironing. But that is the process which is here patented, with hardly a shade of vari-ance. There may be some slight difference in the order, but that is not material. The distinction relied upon is the approximate shaping or "fashioning" of the fabric in the original knitting, which, as it is claimed, is dispensed with. "To distend a tube is our patent," said counsel at the argument, which puts it tersely. But the tube which is thus spoken of is not necessarily confined to one that is strictly cylin-drical, without being shaped or fashioned in any particular. On the contrary, both as described in the patent and as exemplified in practice, it is more nearly bag-shaped or globular. If the patent, indeed, is not broad enough to include this, all that would be necessary to get around it would be to put the fabric in its initial stage into some such form. Speaking of this part of the process in the specifications, the inventor declares that he knits the main body of the fabric which he has to use, of half cardigan or full cardigan loops, which make it loose, while the top and bottom edges are formed of selvage loops, by which the web is narrowed at these two points. This involves a certain amount of fashioning, and produces, not a cylindrical tube, but one, as already suggested, that is globular or balloon-shaped. Confirmatory also of the same idea, it is stated by Braithewaite, one of complainant's expert knitters, speaking of the caps manufactured by this process, "We shape them partly on the machine and partly on the shaper." But if this be so, the essential steps in the process on which the claim to novelty de-pends are matters of degree only. By that which was previously em-ployed, the cap was knit to an approximate shape and then distended, while here the shaping is largely, but not wholly, dispensed with, the process itself in both instances being thus practically unchanged.

But while stress has been laid on the fact that the patent countenances and involves fashioning, the same result is reached even if the tube is strictly cylindrical, and none is employed. The difference is still merely one of degree, the steps in the process, as well as the effect obtained from each, being the same. All that the inventor discovered was that the fabric was capable of being subjected to a little more distending than was supposed possible before, the previous brushing or napping con-tributing to that end. It is true that, if the initial fashioning can be dispensed with, there is a gain in the knitting, and so in the manufac-ture. But passing by the fact that this advantage is not put forward in the patent, the material thing is that the mechanical operations which are made use of do not vary in kind or in order from those previously employed to bring about the same result. The fabric is shaped less and stretched harder, and that is all, which can hardly be said to display invention.

In view of the conclusion which is so reached with regard to the invalidity of the patent, the question of infringement is not important, but it will not be out of the way to express an opinion upon it. It must

be conceded that the attempted distinction between the process made·
use of by the defendant and that described in the patent fails, except in
one particular.   The knit loops on the outside of the defendant's fabric
are of no materiality on this question, whatever advantage may result
from not having to brush the interior and draw upon the body of the
material for the nap.   The patent says nothing of the character of the
fabric, except that it shall be knit, and everything which falls within
this description is therefore covered.   It also calls for an exterior, and
not an interior, brushing, so that nothing can be made out of that.
Neither is there anything in the difference in the manner of blocking.
The inventor suggests in the specifications the use of his own patent
"former" for this purpose, but he by no means confines himself to it, and
it is not mentioned in the claims.   Whatever means of blocking or dis-
tending is employed, as a matter of process, it is the same.   But in the
use of a separately knit band with selvage edge, we have what, in my
judgment, is a variance.   The patent evidently contemplates that there
shall be a single, integral piece of fabric, and not one made up of two
or more parts.   Referring to the initial step in the process, already in
part quoted, the inventor declares:

"I first knit (preferably upon a flat-knitting machine of the ordinary Lamb
type) a piece of fabric,  *  *  *  of which the main portion or body may be
formed of half-cardigan or full-cardigan loops,  *  *  *  while the top and
bottom edges are formed of selvage loops;  *  *  *  the web being conse-
quently narrower at those regions.  The piece of fabric thus obtained is then
formed into a tube  *  *  *  by stitching the two longer sides together.
The deep selvage edge,  *  *  *  which is intended to form the rim or band
of the cap, fitting upon the head of the wearer, is then turned in and stitched
around its inner edge so as to make a double selvage."

There is thus formed what is spoken of in the first claim as "an
elongated tubular body, with a band-forming selvage at its lower open
end"; and in the second claim, as "an open-ended tube of knit fabric,
with a band-forming selvage at one end"; while in the third it is de-
scribed as "a single length of tubular fabric."   In either case it must
be regarded as fulfilled only when body and selvage band are knit as
one web, and not simply sewed together.   Where a union is to be effect-
ed by stitching the inventor is careful to say so; and where, on the
other hand, it may be entirely dispensed with, as where the fabric is
knit in a tubular form at the outstart, he does not forget to point that
out as an alternative.   It may be that the claims, disregarding the spe-
cifications, could be made to include a band-forming selvage that was
sewed on, as well as one that was knit integral with the body.   But the
natural reading is otherwise, and the inventor having explained in the
appropriate place in the specifications what was intended, it is to be
followed.   The complainant certainly cannot expect any broad con-
struction of the patent to be given.   That there are advantages where
the selvage band is integral with the body, as well as where it is not,
sufficient to make a distinction, is shown by the evidence.   In the former
case the band is simply turned over and stitched to the body, saving
work, as well as making a much less prominent and objectionable seam.
But where, on the other hand, the band is made separate, it is not so
liable to be stretched and made ill fitting; and the body, as it is claimed,

can be knit and handled more effectively both with respect to the design and characer of the fabric.

It is said, however, that infringement is confessed by the defendant in his answer to the interrogatories. But however much it may so appear, it is manifest that this was not intended; nor are we, by reason of any such concession, to put a construction on the patent in this case which it will not bear in every other. Notwithstanding what is so answered, the distinction which has been pointed out exists with regard to the integral character of the fabric described in the patent, and it is by this that the question of infringement must be determined.

It is also said that the defendant, in his examination, recognized that there was no material difference between a selvage band which is knit and one which is sewed to the body; speaking of them interchangeably in his testimony. But this occurred in answer to questions put by his counsel in which the identity of the two was assumed, and there is little significance to be given to his answering them, as they were framed, without stopping to mark the distinction. Further than this, it is possible that a separate band which is sewed to the body may, under certain circumstances, be properly spoken of as a selvage band. But that is not controlling. The question is whether the patent, as it stands, calls for the band and the body to be of one integral piece or web, which it plainly does, for reasons already given. Both on the ground, therefore, of the noninfringement of the patent, as well as its invalidity, the suit cannot be maintained.

Let a decree be drawn dismissing the bill, with costs.